## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 23-20232-JAD |
| | ) | |
| RICHARD A. GAY, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |
| ——————————————— | )X | |
| | ) | |
| THOMAS M. DEMARCO and TONI A. DEMARCO, | ) ) | Adversary No. 23-02041-JAD |
| | ) | Related to ECF No. 39 |
| Plaintiffs, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| RICHARD A. GAY, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | )X | |

### MEMORANDUM OPINION

The matter before the Court is the *Plaintiffs' Motion for Summary Judgment*
(the "Motion for Summary Judgment," ECF No. 39) filed by Thomas M. DeMarco
and Toni A. DeMarco (the "Plaintiffs").[1] The Motion for Summary Judgment is
filed in connection with the Plaintiffs' *Complaint to Object to Dischargeability*
*Pursuant to 11 U.S.C. § 523(a)(2), 11 U.S.C. § 523(a)(6) and Federal Rule of*

---

[1] The Court notes that in the filings in this adversary proceeding, the Plaintiffs' surname is spelled both as "DeMarco" and "Demarco." Compare Complaint, ECF No. 1 ¶5 with Motion for Summary Judgment 1. The Court will utilize the "DeMarco" spelling herein.

1

*Bankruptcy Procedure 4004(a)* (the "Complaint") filed against Richard A. Gay (the "Debtor").[2]

Pursuant to the Complaint, the Plaintiffs request that the Court find the liability of the Debtor to the Plaintiffs be determined nondischargeable pursuant to sections 523(a)(2)[3] and/or 523(a)(6) of title 11.

Section 523(a)(2)(A) renders nondischargeable debts sounding in "fraud." By its plain terms, section 523(a)(2)(A) excepts from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" While difficult to define precisely, "fraud" itself "connotes deception or trickery generally[.]" Husky Int'l Elecs., Inc. v. Ritz, 578 U.S. 355, 360 (2016). "Actual fraud" has been described by courts as "any fraud that 'involv[es] moral turpitude or intentional wrong' " (Husky, at 360 (alteration in the original)(quoting Neal v. Clark, 95 U.S. 704, 709 (1878))), and "encompasses debts that arise from 'any deceit, artifice, trick, or design involving direct and active operation of the mind used to

---

[2] This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

[3] The Plaintiffs cite section 523(a)(2)(B) as a basis for relief in the Complaint. Likewise, in their Motion for Summary Judgment, the Plaintiffs aver that there is no genuine issue of material fact as to whether the debt owed by the Debtor is nondischargeable pursuant to sections 523(a)(2)(A) & (B) and 523(a)(6). ECF No. 39 at ¶32. However, in setting forth their summary judgment arguments, the Plaintiffs fail to address the elements relevant to a section 523(a)(2)(B) determination. Instead, the substance of the Plaintiffs' *Brief in Support of Motion for Summary Judgment* ("Plaintiffs' Brief," ECF No. 41) focuses on their claims under sections 523(a)(2)(A) and (a)(6). As such, the Court views the Plaintiffs as having abandoned their section 523(a)(2)(B) arguments solely for purposes of this Motion for Summary Judgment. This conclusion is supported by the statements of the Plaintiffs' counsel at the hearing on the Motion for Summary Judgment, wherein it was represented that "the [Plaintiffs] filed Summary Judgment, and there are two sections that we filed under, 523(a)(2)(A) and 523(a)(6)." Summary Judgment Hr'g Tr., ECF No. 55, 6:11-13.

circumvent and cheat another.' " <u>Compton v. Moschell (In re Moschell)</u>, 607 B.R. 487, 496 (Bankr. W.D. Pa. 2019)(quoting <u>Elliott v. Kiesewetter (In re Kiesewetter)</u>, 391 B.R. 740, 746 (Bankr. W.D. Pa. 2008)(citing <u>McClellan v. Cantrell</u>, 217 F.3d 890, 893 (7th Cir. 2000)(citation omitted))).

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6). For purposes of section 523(a)(6), an injury is "willful" if the injury itself was purposefully inflicted by the actor or the actor "acted with substantial certainty that injury would result." <u>In re Moschell</u>, 607 B.R. at 500 (citing <u>Conte v. Gautam (In re Conte)</u>, 33 F.3d 303, 307 (3d Cir. 1994)). An injury is malicious if the conduct causing it was "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." <u>In re Moschell</u>, 607 B.R. at 500 (quoting <u>Wymard v. Ali (In re Ali)</u>, 321 B.R. 685, 693 (Bankr. W.D. Pa. 2005)(citation omitted)).

For the reasons set forth below, this Court finds that there is no genuine issue of material fact, and that the Plaintiffs are entitled to a judgment as a matter of law with respect to a finding of nondischargeability of the debt due from the Debtor to the Plaintiffs.

## I.

Prior to the Debtor's bankruptcy case filing, the Plaintiffs commenced an action (the "State Court Action") in the Court of Common Pleas of Beaver County, Pennsylvania (the "State Court"), naming the Debtor as a defendant along with

Carrie Redden (a non-debtor who is not party to this adversary case).[4] The State

Court Action resulted in verdicts being entered in favor of the Plaintiffs and

against the Debtor and Ms. Redden.

The evidence presented by the Plaintiffs is essentially a reproduction of the

State Court Action. Those proceedings reflect that:

1. The Plaintiffs purchased real property located at 315 Blackhawk Road, Beaver Falls, Pennsylvania (the "Property") from the Debtor and Ms. Redden in February 2019. State Court Transcript, Vol. II, ECF No. 52, 25:4-17.[5]

2. Prior to purchase, the Plaintiffs received from the Debtor and Ms. Redden a *WPML Seller Disclosure Statement* (the "Seller Disclosure Statement").[6] State Court Transcript, Vol. II, 27-28.

3. The Plaintiffs reviewed the Seller Disclosure Statement prior to signing the sales agreement for the purchase of the Property and relied upon its contents in deciding to purchase the Property. State Court Transcript, Vol. II, 29-30 & 137-138.

4. Additionally, the Plaintiffs viewed the Property prior to purchase at which time the yard was snow-covered (State Court Transcript, Vol. II, 37:14-21) and the Plaintiffs arranged for a house inspection prior to closing. State Court Transcript, Vol. II, 146-147. The Plaintiffs' testimony suggests

---

[4] The claims asserted in the State Court Action were for fraud/intentional misrepresentation, intentional nondisclosure, violation of real estate seller disclosure law, breach of contract, and violation of the Unfair Trade Practice and Consumer Protection Law (the "UTPCPL"). *Plaintiffs' Concise Statement of Material Facts* ("Plaintiffs' Concise Statement"), ECF No. 40 ¶17; *Defendant's Responses to Plaintiffs' Concise Statement of Facts and Defendant's Counter-Concise Statement of Material Facts* ("Debtor's Response to Concise Statement"), ECF No. 48 ¶17 (admitting that the State Court Action was filed but denying the claims asserted).

[5] The transcript of the State Court Action was docketed in two separate filings, which are collectively comprised of four volumes. Volumes I, III, and IV are filed at ECF No. 51, and Volume II is filed at ECF No. 52 (together, the "State Court Transcript").

[6] The Seller Disclosure Statement was introduced in the State Court Action as "Exhibit 3." State Court Transcript, Vol. II, 37:7-12. The Seller Disclosure Statement is docketed in the current matter as part of the Plaintiffs' *Appendix of Documents in Support of Motion for Summary Judgment* (the "Summary Judgment Appendix," ECF No. 43) as "Appendix Exhibit 4," ECF pgs. 163-172.

that no drainage or flooding issues were observed pursuant to either the Plaintiffs' viewing of the Property or the inspection.

5.  Beginning in April 2019, the Plaintiffs began to experience ponding, puddling, and flooding on the Property in the front and backyard. State Court Transcript, Vol. II, 38:17-25.

6.  Photographs showing the water issues on the Property were introduced at trial in the State Court Action. State Court Transcript, Vol. II, 39-71.[7]

7.  Mr. DeMarco testified that the severity of the water issues depends on the level of rain, but the Property has flooded "dozens" of times since purchase and the yard is rendered unusable. State Court Transcript, Vol. II, 39:1-17.

8.  The Plaintiffs testified that the yard was important to them in deciding on the Property. State Court Transcript, Vol. II, 72:15-20 & 139:13-22.

9.  Additionally, Mr. DeMarco testified that the yard has a "heavy infestation" of insects due to the water and the Plaintiffs' shed is sinking "because it's so wet." State Court Transcript, Vol. II, 72:4-14.

10. The Plaintiffs have also experienced mold issues in the garage. State Court Transcript, Vol. II, 111-112

11. The Plaintiffs each testified that they would not have purchased the Property if they were aware of the flooding issues. State Court Transcript, Vol. II, 84:21-25 & 139:18-22.

12. Mr. DeMarco testified that prior to purchasing the Property, he was not aware that wetlands or a drainage easement existed on the Property. State Court Transcript, Vol. II, 30:9-22.

13. Mr. DeMarco testified that he did not become aware of the drainage system on the Property until after purchase and in the course of litigation. State Court Transcript, Vol. II, 81:3-22. The drainage system has connected catch-basins and the system is connected to neighboring properties.

---

[7] The photographs introduced in the State Court Action were labeled (as stated in the State Court Transcript) as Exhibits 5a, 5b, 5c, 6, 7, 8a, 8b, 8c, 8d, 8e, 8f, 9a, 9b, 9c, 9d, 10a, 10b, 10c, 10d, 11, 12a, 12b, 12c, 12d, 12e, 12f, 12g, 12h, 12i, 12j, 12k, 26b, 26c, 26d, 26e, 26f, 26g, 26h, and 26i. State Court Transcript, Vol. II, 39-71. Photographs labeled as Exhibits 5A, 5B, 5C, 6, 7, 8A, 8B, 8C, 8D, 8E, 8F, 9A, 9B, 9C, 9D, 10A, 10B, 10C, 10D, 11, 12A, 12B, 12C, 12D, 12E, 12F, 12G, 12H, 12I, 12J, and 12K are included in the Summary Judgment Appendix as "Appendix Exhibit 7" (ECF pgs. 272-303).

14. The Plaintiffs testified that they relied on and were misled by the representations in the Seller Disclosure Statement. State Court Transcript, Vol. II, 85:5-12 & 139-140.

15. In the Seller Disclosure Statement, the Debtor and Ms. Redden answered "No" to the following questions:

   a. "To your knowledge, is the Property, or part of it, located in a flood zone or wetlands area?" Seller Disclosure Statement ¶17(E).

   b. "Do you know of any past or present drainage or flooding problems affecting the Property or adjacent properties?" Seller Disclosure Statement ¶17(F).

   c. "Are you aware of any material defects to the Property, dwelling, or fixtures which are not disclosed elsewhere on this form?" Seller Disclosure Statement ¶20(F).

   d. "Is there any additional information that you feel you should disclose to a prospective Buyer because it may materially and substantially affect the value or desirability of the Property[?]" Seller Disclosure Statement ¶20(J).

16. At trial, a subdivision plan was introduced that was recorded by the Debtor and Ms. Redden relative to the Property. State Court Transcript, Vol. II, 31-32. The subdivision plan shows a wetland area that Mr. DeMarco testified was filled in by the Debtor and Ms. Redden. The Plaintiffs did not receive the subdivision plan from the Debtor and Ms. Redden until after closing.

17. John Syka, a neighbor of the Plaintiffs, testified that prior to the Plaintiffs' purchase of the Property, and during the Debtor and Ms. Redden's ownership, he observed ponding on the Property with "every decent rain." State Court Transcript, Vol. II, 193-194.

18. Amy Egger, a neighbor of the Plaintiffs whose house is located to the rear left of theirs, testified that she had resided in her home for 26 or 27 years. Ms. Egger testified that when the Debtor and Ms. Redden purchased the parcel containing the Property, it was "like a farm" which they developed into separate homes. State Court Transcript, Vol. II, 202-203.[8]

---

[8] Ms. Egger was asked about the Property specifically, her response's reference to the subsequent development of multiple homes indicates that her description concerns a larger parcel containing the Property.

19. When asked to describe the "water courses, gullies," with respect to the property the Debtor and Ms. Redden owned, Ms. Egger testified that:

> "There, yeah, I mean water, you know, unfortunately, their property's the lowest. It's lower than ours on Naugle Road and all the roads around it, so there's always been water. It's always muddy, but there used to be like a creek. Well, that's probably not, like a stream, and all the water kind of collected there and went out, but it seemed like, well she built and covered that all up, and then that made a lot of the like flooding kind of issues I think happened in my opinion."

> State Court Transcript, Vol. II, 203:11-22.

20. Ms. Egger also testified that she is able to view the backyard of the Property and that she had observed flooding in the backyard prior to the Plaintiffs' purchase of the Property while owned by the Debtor and Ms. Redden. State Court Transcript, Vol. II, 203-204. Also, that flooding in the backyard occurred "[e]very time there's a good rain[.]" State Court Transcript, Vol. II, 211:15.

21. The Plaintiffs consulted a contractor (Classic Landscaping) with respect to resolving the water issue, but that proposal was viewed as insufficient to resolve the water problems.  State Court Transcript, Vol. II, 93:10-19.

22. The Plaintiffs hired Widmer Engineering to address the flooding. State Court Transcript, Vol. II, 81-82. Widmer estimated that it would cost approximately $162,952 to remediate the flooding issue. State Court Transcript, Vol. II, 230:16-18.

23. At trial, Tony Sadaka, a Civil Engineer with Widmer Engineering testified regarding Widmer Engineering's proposed plan to remediate the water issues.

24. The Plaintiffs hired Ed Cline to appraise the Property. State Court Transcript, Vol. II, 83:10-19.

25. Mr. Cline testified that in its unrepaired state (i.e. with the flooding issues unremedied), the Property's fair market value (as of November 19, 2021) was $385,000 versus $435,000[9] repaired. State Court Transcript, Vol. II, 162-163, 166:12-14, 169-170.

---

[9] At times during his testimony, Mr. Cline cited the repaired value as $425,000. He clarified that in stating $425,000 he misspoke and confirmed that the repaired value was $435,000. State Court Transcript, Vol. II, 190:3-10.

26. At trial, the Debtor and Ms. Redden did not present any evidence on their behalf. State Court Transcript, Vol. III, ECF No. 51-3, 24-25.

At the close of evidence in the state court proceedings, the trial court judge charged the jury on the claims submitted to them.

As to the claims generally, the jury was instructed to apply the law as stated by the State Court and not to deviate from the standards articulated in the charge.[10]

On the claim of fraudulent misrepresentation, the jury was instructed that the Plaintiffs had the burden of proving by clear and convincing evidence that: (1) "the [d]efendants separately made a misrepresentation to the [p]laintiffs[,]" (2) "the misrepresentation made by the [d]efendants was fraudulent[,]" (3) the "misrepresentation was of a material fact[,]" (4) "the [d]efendants intended the [p]laintiffs to rely upon that misrepresentation when it was made[,]" (5) the [p]laintiffs relied upon the misrepresentation[,]" and (6) "the [p]laintiffs' reliance on the [d]efendants' misrepresentation was a factual cause of harm." State Court Transcript, Vol. III, 112:12-25.

With respect to the Plaintiffs' claim for violation of Real Estate Disclosure Law, the State Court instructed that:

> Any seller who intends to transfer any interest in real property shall disclose to the buyer any material defects with the property known to the seller by completing all applicable items in a property disclosure statement. . .

---

[10] The State Court instructed that "You will apply the law that I'm about to instruct you on. You will not apply any other law which any of you know or think you know. . . . As I mentioned to you at the outset of this case it is my responsibility to decide all questions of law, and you must [accept] and follow my rulings and instructions on matter[s] of law." State Court Transcript, Vol. III, 96:8-22.

. . . A signed and dated copy of the property disclosure statement shall be delivered to the buyer prior to the signing of an agreement of transfer of the property by the seller to the buyer with respect to the property.

A seller shall not be liable for any error, inaccuracy, or omission, or omission of any information delivered to this chapter if the seller had no knowledge of the error, inaccuracy, or omission.

Any person who willfully or negligently violates or fails to perform any duty prescribed by any provision of this chapter shall be liable[.]

State Court Transcript, Vol. III, 115-116.

On the Plaintiffs' breach of contract claim, the State Court instructed that two elements must be proven: "The existence of a contract including its essential terms, and that the terms of that agreement were breached by the [d]efendants." State Court Transcript, Vol. III, 117:12-15.

The State Court also provided additional instruction on the topic of material versus immaterial breach.

For all three claims, the State Court instructed that if the Plaintiffs sustained their burden of proving any or all of the claims, and that the Plaintiffs were caused harm by those claims, then damages must be determined in accordance with the State Court's further instruction.

In addition to compensatory damages, the jury was instructed that with respect to the fraudulent misrepresentation claim, punitive damages may be awarded if the "conduct of the [d]efendants was outrageous[.]" State Court Transcript, Vol. III, 121:12. Further that "conduct is outrageous when it is malicious, wantant [sic], willful, or oppressive, or shows reckless indifference to the interest of others." State Court Transcript, Vol. III, 121:18-21.

Ultimately, on January 12, 2023, the jury returned a verdict in favor of the Plaintiffs and against both the Debtor and Ms. Redden on the claims of fraudulent misrepresentation, violation of Real Estate Disclosure Law, and breach of contract. On those claims, the jury awarded the Plaintiffs $173,000 in compensatory damages, along with $35,000 in punitive damages awarded for the Debtor's and Ms. Redden's outrageous conduct. Plaintiffs' Concise Statement ¶¶21-23; Debtor's Response to Concise Statement ¶¶21-23. See also *Jury Verdict* 1-3, included as part of the *Certified Copies of Documents Requested by Order of the Court*, ECF No. 33.

In addition to the claims submitted to the jury, the Honorable James J. Ross of the State Court was tasked with deciding whether the Debtor and Ms. Redden violated the UTPCPL.[11] Finding that they had, on January 12, 2023, the State Court awarded the Plaintiffs $519,000 in treble damages on account of the Debtor's and Ms. Redden's "intentional or reckless, wrongful conduct[.]" *Court Verdict*, included as part of the *Certified Copies of Documents Requested by Order of the Court*, ECF No. 33.

In rending its decision on the UTPCPL claim, the State Court set forth on the record the following:

> That the [defendants[12]] owned the property in question for an extended period of time. They actually constructed the house that

---

[11] As set forth in the record of the State Court Action, Judge Ross observed that under prevailing state law, there is no right to a jury trial under the UTPCPL. Consequently, determinations of such claims are to be made by the assigned judge. State Court Transcript, Vol. IV, 21-22.

[12] In the State Court Transcript, the Court identifies the DeMarcos as owning the Property for an extended period of time and constructing the house. Based on the record, this appears to be a simple misstatement and that the State Court intended to reference the defendants, Mr. Gay and Ms. Redden.

the Plaintiffs' purchased. Testimony from the trial from neighbors indicated that the significant water issue on the property that the Demarco's presently own existed well before the sale of the real estate, and furthermore, when the subdivision was presented to the township, it indicated that the Defendants, Gay and Redden, would be responsible for a stormwater management system in connection with the development and responsible for stormwater problems. Moreover, the photographs that were provided established that there is a significant ponding and water problem on the property and the damages regarding repair were presented by an engineer.

The Court notes that when the property was sold by Gay and Redden to Demarco, the Demarco's, the Defendants denied that there had been any water or flooding problems on the property and that there was not a wetland on the property, both of which turned out to be untrue, and more importantly, the survey that the Defendants provided to the township to authorize the existence of the subdivision indicated [that] a wetland was present. The Defendants actually denied these matters in the Seller Disclosure Law by answering no.

The Court finds that this conduct . . . the Court believes that the deceptive practices and fraud were established by a preponderance of the evidence; therefore, in question one of the Court's verdict, the Court found that the Demarco's did sustain their burden of proof under their claim under the Unfair Trade Practices and Consumer Protection Law.

Question two, did the Demarco's sustain their burden of proof of intentional or reckless wrongful conduct to warrant an award of treble damages under the Unfair Trade Practice and Consumer Protection Law? The Court finds that the proof does establish outright denials to clearly existing problems with the real estate that were evidenced not, by not only by testimony but photographs of the property in connection with this case, and the Court believes that treble damages are in order.

State Court Transcript, Vol. IV, ECF No. 51-4, 24-26.

The State Court thereafter molded the verdict to $519,000 in compensatory/treble damages and $35,000 in punitive damages, for a total verdict of $554,000 (the "Molded Verdict," and together with the jury and State Court verdicts, the "Verdicts") on January 13, 2023. See Molded Verdict, included as "Appendix Exhibit 12" in the Summary Judgment Appendix at ECF pg. 319.

Neither the Defendant nor Ms. Redden filed post-trial motions seeking reconsideration of the Verdicts. However, on January 19, 2023, the Plaintiffs filed motions for attorney's fees and delay damages. Plaintiffs' Concise Statement ¶¶27-29; Debtor's Response to Concise Statement ¶¶27-29.

The Debtor filed a *Voluntary Petition for Individuals Filing for Bankruptcy* with this Court on February 2, 2023, whereby he sought relief under chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 et seq.).[13] The filing effectively stayed the State Court Action as to the Debtor, but not as to Ms. Redden.

Following disposition of her own bankruptcy case,[14] a praecipe to enter judgment against Ms. Redden upon the Verdicts was filed in the State Court Action on October 2, 2023. See Docket of State Court Action, 2020-10457 in the Beaver County Court of Common Pleas.[15]

The Plaintiffs commenced this adversary proceeding on May 5, 2023, seeking to except from discharge their claim[16] based upon the Molded Verdict and stemming from the Debtor's averred fraudulent (11 U.S.C. § 523(a)(2)) and

---

[13] The Debtor's bankruptcy case was converted to one under chapter 7 of the Bankruptcy Code by *Order of Court* dated November 30, 2023. 23-20232-JAD, ECF No. 64.

[14] Ms. Redden filed her own bankruptcy case with this Court on February 14, 2023, which was docketed at Bankruptcy No. 23-20320-JAD. Ms. Redden's bankruptcy case was subsequently dismissed on September 22, 2023.

[15] A court may take judicial notice of the contents of another court's docket. Orabi v. Attorney Gen. of the U.S., 738 F.3d 535, 537 n.1 (3d Cir. 2014).

[16] The Plaintiffs filed a *Proof of Claim* (identified as Claim No. 1 on the Claims Register of the Debtor's bankruptcy case) in the amount of $607,771.43. See Claim No. 1 at ¶7. Pursuant to the "Addendum to Proof of Claim of Thomas M. DeMarco and Toni A. DeMarco," the total amount claimed is comprised of the Verdicts ($554,000), plus attorney's fees in the amount of $41,584.41 and delay damages in the amount of $12,187.02.

12

willful and malicious (11 U.S.C. § 523(a)(6)) conduct. The Debtor and the Plaintiffs (together, the "Parties") were then afforded an opportunity to undertake discovery, and the Plaintiffs' Motion for Summary Judgment followed.

In response to the Motion for Summary Judgment, the Debtor offered no new facts supporting his defense. Instead, he merely contends that the existing record does not support a finding of nondischargebility.

This Court disagrees.

## II.

"The standard for summary judgment has long been established." Scott v. U.S. Bank, Nat'l Assoc. (In re Scott), 607 B.R. 211, 226 (Bankr. W.D. Pa. 2019).

Federal Rule of Civil Procedure 56, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, provides in part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

As previously observed by this Court, the standard for summary judgment has been elaborated on as follows:

> "Summary judgment is appropriate only where ... there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." Melrose, Inc. v. Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010) (quoting Ruehl v. Viacom, Inc., 500 F.3d 375, 380 n.6 (3d Cir. 2007)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 [106 S.Ct. 2548, 91 L.Ed.2d 265] (1986); Fed. R. Civ. P. 56(a). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 [106 S.Ct. 2505, 91 L.Ed.2d 202] (1986); see also McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. Anderson, 477 U.S. at 248

13

[106 S.Ct. 2505]. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." <u>Am. Eagle Outfitters v. Lyle & Scott Ltd.</u>, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.' " <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 278 (3d Cir. 2000) (quoting <u>Armbruster v. Unisys Corp.</u>, 32 F.3d 768, 777 (3d Cir. 1994)).

> The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323 [106 S.Ct. 2548]. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 n.11 [106 S.Ct. 1348, 89 L.Ed.2d 538] (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." <u>Coolspring Stone Supply v. Am. States Life Ins. Co.</u>, 10 F.3d 144, 148 (3d Cir. 1993); <u>see also</u> <u>Podobnik v. U.S. Postal Serv.</u>, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

<u>In re Scott</u>, 607 B.R. at 226–227 (quoting <u>Hadeed v. Advanced Vascular Res. of Johnstown, LLC</u>, No. 3:15-CV-22, 2017 WL 4998663, at *4 (W.D. Pa. Oct. 30, 2017)).

## III.

A primary contention of the Plaintiffs is that summary judgment should be entered in their favor because collateral estoppel principles prevent re-litigation of the matters decided in the State Court Action.

In that respect, resolution of the Motion for Summary Judgment raises two significant legal issues: (1) whether the Verdicts preclude litigation of the matters heard in the State Court Action, and if so, (2) whether the determinations made therein merit a finding of nondischargeability under sections 523(a)(2) and/or 523(a)(6) of title 11.

The doctrine of collateral estoppel prevents the re-litigation of a question of law or an issue of fact that has been resolved in a prior court proceeding. Aiello v. Aiello (In re Aiello), 533 B.R. 489, 493-494 (Bankr. W.D. Pa. 2015)(citations omitted), aff'd sub nom. Aiello v. Aiello, 550 B.R. 83 (W.D. Pa. 2016), aff'd sub nom. Aiello v. Aiello (In re Aiello), 660 F. App'x 179 (3d Cir. 2016). "Issue preclusion (collateral estoppel) is applicable in proceedings concerning dischargeability of debts in bankruptcy court." In re Kiesewetter, 391 B.R. at 744 (citing Grogan v. Garner, 498 U.S. 279, 284-285 n.11, 111 S.Ct. 654, 658, 112 L.Ed.2d 755 (1991)).

Federal courts must give state court judgments preclusive effect where the court of the issuing state would do so. In re Aiello, 533 B.R. at 494. In making a determination as to the preclusive effect of a state court judgment, courts look to the law of the adjudicating state. Id. (citations omitted).

The Verdicts at issue in this matter were rendered by a Pennsylvania state court and thus, Pennsylvania collateral estoppel principles apply. Pursuant to which the following factors must be shown for the Verdicts to have a preclusive effect: "(1) identity of issues; (2) final judgment on the merits; (3) identity of parties; (4) party seeking to relitigate had a full and fair opportunity to argue the

issue in the prior proceeding." <u>In re Aiello</u>, 553 B.R. at 494 (footnote and citations omitted).

## A.

It is undisputed that the Parties to this litigation were also parties to the State Court Action. Moreover, there is no genuine dispute that the Debtor had a full and fair opportunity to argue the issues in the State Court Action.

To this latter point, the Debtor states both that, "At the instruction of his prior counsel, the [Debtor] did not testify or present evidence in his defense[,]" (*Defendant's Brief in Opposition to Plaintiffs' Motion for Summary Judgment* ("<u>Debtor's Brief</u>"), ECF No. 49, 17) and that Debtor's trial counsel did not "allow [him] to present his position." *Defendant's Response in Opposition to Plaintiffs' Motion for Summary Judgment* ("<u>Debtor's Response to Motion for Summary Judgment</u>"), ECF No. 47 ¶15.

The Court finds the Debtor's position unavailing. While the Debtor may regret the choice of litigation tactics utilized in the prior proceeding, it does not mean that the Debtor was denied the opportunity to litigate the case. Indeed, the record is that the Debtor was represented by counsel and a jury trial was held in the State Court Action. In other words, just because the Debtor was "advised by his prior counsel not to testify and not to present evidence on his behalf[,]" (Debtor's Brief 7) it does not follow that he was denied the opportunity to do so.

Of the two remaining elements, the Parties focus the bulk of their arguments on whether a genuine issue of material fact exists with respect to the "identity of issues" prong. In that, the Parties primarily address whether the

elements of the various state-court causes of action for which liability was assessed by the jury and State Court itself are sufficiently similar to the elements of the exceptions to discharge asserted (11 U.S.C. §§ 523(a)(2) and (a)(6)).

What is not contested is that the Verdicts rendered in the State Court Action constitute a final judgment on the merits. However, while the Debtor does not contest that the Verdicts are a final judgment,[17] the onus is still on the Plaintiffs to establish that there is no genuine issue of material fact as to the finality of the Verdicts to obtain summary judgment relief.

## B.

Significant to this point is the fact that while the Verdicts were entered, it appears that no final judgment was formally entered on the docket against the Debtor.

As observed by the United States Bankruptcy Court for the Eastern District of Pennsylvania:

> Unlike the federal judicial system, where a judgment typically is entered immediately following the issuance of a decision resolving a case, see Fed.R.Civ.P. 58, in the Pennsylvania state court system, a judgment ordinarily is not entered until after post-trial motions have been decided or, where no post-trial motions have been filed, until after the 10–day time period for filing such motions has elapsed. See Pa. R. Civ. P. 227.4(1), 227.1.

Funches v. Household Fin. Consumer Discount Co. (In re Funches), 381 B.R. 471, 478 (Bankr. E.D. Pa. 2008).

---

[17] See *Answer to Plaintiffs' Complaint Objecting to Dischargeability Pursuant to 11 U.S.C. § 523(A)(6) and Federal Rule of Bankruptcy Procedure 4004(A)*, ECF No. 23 ¶ 8 (wherein the Debtor avers that "the Plaintiffs hold a claim as a result of a judgment").

Moreover, such entry of final judgment does not appear to be automatically triggered by the expiration of the timeframe for post-trial motions. As set forth in Pennsylvania Rule of Civil Procedure 227.4, "the prothonotary shall, *upon praecipe of a party* . . . enter judgment upon a nonsuit by the court, the verdict of a jury or the decision of a judge following a trial without jury, if . . . no timely post-trial motion is filed[.]" Pa.R.C.P. 227.4(1)(a). In addition to the filing itself, notice of the praecipe is required to be given to the other parties to the litigation (Pa.R.C.P. 237), and the prothonotary is required to give notice of the entry of an order or judgment to the parties (Pa.R.C.P. 236(a)(2)).

These rules make it clear that there is a definite distinction between a "verdict" and a "judgment" under Pennsylvania state law. See also Loomis Lake Ass'n v. Smith, 531 A.2d 1152, 1155 (Pa. Super. 1987)("The jury verdict, in this case, is not the same as a judgment. A verdict is the jury's findings of fact; a judgment, however, is the court's determination of the case upon the jury's verdict.")(citing 46 Am.Jur.2d Judgments § 4)).

For our purposes, the question then arises of whether the Verdicts constitute a "final judgment on the merits" for purposes of collateral estoppel under Pennsylvania law.

In its own research, this Court observes that some courts applying Pennsylvania law have held that a verdict which has not yet been reduced to judgment does not support collateral estoppel. See Dougherty v. Lehigh Coal & Navigation Co., 52 A. 18, (Pa. 1902)("No question becomes res adjudicata until it is settled by a final judgment. For this reason the verdict of a jury is not

18

admissible as evidence to create an estoppel before it has received the sanction of the court by passing into a judgment. Until then it is liable to be made nugatory by an order arresting judgment or granting a new trial." (quoting Freem. Judgm. § 251)). <u>See also</u> <u>Belmonte v. Belmonte (In re Belmonte)</u>, 279 B.R. 812, 815 (Bankr. E.D. Pa. 2001)(state court verdict did not support issue preclusion because due to pending post-trial motion, the verdict was not "procedurally definite pursuant to Pa.R.Civ.P. 227.4 and [was] not final for the purpose of issue preclusion pursuant to section 13 of the Restatement (Second) of Judgments.")

However, the Third Circuit Court of Appeals applied a less absolute approach to determining whether a disposition warranted collateral estoppel in <u>Greenleaf v. Garlock, Inc.</u>,174 F.3d 352 (3d Cir. 1999), <u>superseded on other grounds as stated in</u> <u>Jeckell v. Crestwood Area School Dist.</u>, No. 3:04cv1135, 2008 WL 4372797, at *2-*3 (M.D. Pa. Sept. 18, 2008)(observing amendment to Federal Rule of Civil Procedure 50 regarding timing of motion for judgment as a matter of law and departure from law as applied in <u>Greenleaf</u>).

In <u>Greenleaf</u>, the plaintiffs commenced a diversity action in federal court related to the plaintiff-husband's alleged asbestos exposure and resultant mesothelioma. During the conduct of the federal action, the plaintiffs also filed a state action against several Pennsylvania defendants. The federal action was thereafter stayed, and while stayed the plaintiffs proceeded to a reverse-bifurcated trial in the state court action whereby damages were to be determined first and then liability. In the damages phase, the state-court jury returned a verdict of $151,870 for the plaintiff-husband's estate (he had passed following

case commencement) and $37,500 for loss of consortium. The plaintiffs filed a motion for additur.

Prior to the liability phase, the plaintiffs settled with two of the state-court defendants and the state action was marked "settled, discontinued and ended."

The federal action was subsequently reactivated, and certain of the federal-court defendants sought summary judgment on the basis that, inter alia, issue preclusion prevented re-litigation of the plaintiffs' damages. Said motion was denied.

An issue on appeal to the Third Circuit Court of Appeals was whether the state-court jury's damages verdict was a "final judgment" for purposes of issue preclusion (collateral estoppel). Greenleaf, at 358.

Relative to this issue, the Third Circuit Court of Appeals observed that for purposes of collateral estoppel, what matters is whether the prior conclusion is "procedurally definite." In doing so, the Third Circuit wrote as follows:

> The Pennsylvania Supreme Court consults section 13 of the Restatement (Second) of Judgments to define "final judgments" for purposes of issue preclusion. See Shaffer [v. Smith], 673 A.2d [872,] 875 [Pa. 1996]. Section 13 provides:
>
>> The rules of res judicata are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished from merger and bar), "final judgment" includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded preclusive effect.
>
> Restatement (Second) of Judgments § 13 (1982). The comments to section 13 emphasize that issue preclusion is applicable when it is determined "that the decision to be carried over was adequately deliberated and firm, even if not final in the sense of forming the basis for a judgment already entered." Id. § 13 cmt. g.

> [To require that] a final judgment in the strict sense has been reached in the first action can involve hardship—either needless duplication of effort and expense in the second action to decide the same issue, or, alternatively, postponement of decision of the issue in the second action for a possibly lengthy period of time until the first action has gone to a complete finish. In particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment.

> Id. Accordingly, the Restatement recognizes that the finality inquiry focuses upon "whether the conclusion in question is procedurally definite." Id. Section 13's comments provide a number of factors to be considered in this regard:

> > (1) whether the prior decision was "adequately deliberated and firm" and not "avowedly tentative";

> > (2) whether the parties were fully heard;

> > (3) whether the court supported its decision with a reasoned opinion;

> > (4) whether the court's prior decision was subject to appeal or was in fact reviewed on appeal.

> Id.

Greenleaf, 174 F.3d at 358.

Applying those factors (the factors set forth in the comments to section 13), the Third Circuit found that the state-court jury verdict was a "final judgment" with preclusive effect.  In so determining, the Third Circuit observed that in executing the settlement with the state-court defendants, the plaintiffs had forfeited their right to further review and that the dismissal order entered pursuant to the settlement rendered the damages assessment " 'procedurally definite' and not subject to change." Greenleaf, at 359.[18]

---

[18] This Court observes that forfeiture of a right to appellate review is not the litmus test for finality of a judgment for purposes of application of collateral estoppel and res judicata.  In fact, courts have found the doctrines applicable even in instances where the final order being enforced or applied is the subject of appeal. See, e.g., United States v. 5 Unlabeled Boxes, 572 F.3d 169, 175 (3d Cir. 2009)("the pendency of

Case 23-02041-JAD    Doc 58    Filed 06/11/24    Entered 06/11/24 14:30:45    Desc Main
Document    Page 22 of 55

This Court finds the rationale of <u>Greenleaf</u> persuasive and the concerns raised in <u>Dougherty</u> and <u>In re Belmonte</u> nonetheless do not appear to be an issue in this case. Specifically, in both <u>Dougherty</u> and <u>Belmonte</u>, the rationale for denying collateral estoppel effect to a verdict, as opposed to a judgment, appears to be rooted in nonfinality of the verdict due to pending post-trial motions. For example, in <u>Dougherty</u> it was observed that:

> The error into which counsel for appellant seems to have fallen is in confounding a verdict upon which judgment has been entered, or which cannot be disturbed, with one upon which judgment cannot be entered *until the court passes upon the reasons before it for setting it aside*. A verdict, when rendered, is under the control of the court in which the case was tried, and the power to set it aside for good reasons must be exercised. Without this power and its exercise in proper cases, justice could not be judicially administered. The verdict which in this case the appellant insists was conclusive of her

---

an appeal does not affect the potential for res judicata flowing from an otherwise-valid judgment"); <u>Shaffer v. Smith</u>, 673 A.2d at 874 ("A judgment is deemed final for purposes of *res judicata* or collateral estoppel unless or until it is reversed on appeal"); <u>Ross v. Meyer</u>, 741 F.App'x 56, 60 (3d Cir. 2018)(quoting <u>5 Unlabeled Boxes</u>, at 175); <u>and</u> <u>Sherman v. Jacobson</u>, 247 F.Supp. 261, 268 & 270 (S.D.N.Y. 1965)(neither pending appeal or possibility of appeal will prevent application of collateral estoppel).

In making the above observation, this Court is mindful that the Third Circuit Court of Appeals in <u>5 Unlabeled Boxes</u> included the following language in its decision:

> The Restatement (Second) of Judgments, noting that a final judgment will customarily be given preclusive effect even though an appeal is pending, suggests, if possible, postponing decision on the question of preclusion in a second action until the appeal of the first judgment has been concluded. Restatement (Second) of Judgments, § 13, cmt. f.

572 F.3d at 175.

In exercising its equitable discretion, and with due consideration of the entire record as presented by the Parties, this Court sees no reason to postpone a decision on the question of issue preclusion because many circumstances support applying collateral estoppel at this moment. They include the fact that the state-court Verdicts are sufficiently definite, and the Court's own independent review of the State Court Action is that the chances of the Debtor being successful on an appeal is quite remote given the standard of appellate review. The Debtor also has not articulated any cognizable error committed by the state trial court. In addition, the Court sees no reason to further delay the administration of this bankruptcy case given the fact that, regardless of the application of collateral estoppel, the Debtor has produced no evidence rebutting the evidence the Plaintiffs have propounded in support of their motion— thus warranting entry of summary judgment in favor of the Plaintiffs finding the debts at issue to be nondischargeable.

22

right to the money was subsequently set aside by the court, and *at the time she wished to offer it in evidence the motion to set it aside was pending.* It was then evidence of nothing at all, except that it had been rendered. It was conclusive of nothing, for the record of which it formed a part showed at the time it was offered in evidence that it might be set aside. As a matter of fact, as already stated, it was thereafter set aside, and on the new trial awarded a finding might have been against her, instead of for her. *The uncertainty of her right to judgment on it at the time she wished to use it as conclusive of her right to the money in controversy made it uncertain, and of no value as a piece of evidence in support of her claim.* If judgment had been entered on it, it would have been conclusive upon the parties to the issue in which it was rendered of what the jury had found; but with no judgment on it it was inadmissible.

Dougherty, 52 A. at 18 (italics added).

Similarly, in Belmonte, following the trial court's verdict, the debtor filed a timely motion for post-trial relief which was still pending at the time he commenced his bankruptcy case. See In re Belmonte, 279 B.R. at 814. Initially, the bankruptcy court found that the state-court verdict was final for purposes of issue preclusion. The district court reversed that decision on appeal stating that because a post-trial motion remained undecided due to the imposition of the automatic stay, the verdict was not "procedurally definite" pursuant to Pennsylvania Rule of Civil Procedure 227.4 and was not final for purposes of issue preclusion in accordance with section 13 of the Restatement (Second) of Judgments. In re Belmonte, at 815.[19]

---

[19] The district court in In re Belmonte acknowledged the bankruptcy court's citation to Greenleaf v. Garlock, Inc. but found Greenleaf distinguishable because in the absence of the settlement and dismissal order present in Greenleaf, the Belmonte debtors had not "voluntarily surrendered their right to further review" of the verdict and there was no dismissal order to assure that the verdict was " 'procedurally definite' and not subject to change." In re Belmonte, at 815. As noted *infra*, this case is distinguishable from Belmonte.

The case *sub judice* is distinguishable from both <u>Dougherty</u> and <u>In re Belmonte</u> because at the time the Debtor's bankruptcy case was commenced no post-trial motions were pending which could disturb the Verdicts and the time-period to bring such motions had passed.[20]

The use of the word "shall" in Pennsylvania Rule of Civil Procedure 227.4, governing entry of judgment upon praecipe of a party, makes the entry of the judgment by the prothonotary mandatory where the listed conditions have been satisfied.

That rule provides that:

> In addition to the provisions of any Rule of Civil Procedure or Act of Assembly authorizing the prothonotary to enter judgment upon praecipe of a party and except as otherwise provided by Rule 1042.72(e)(3), the prothonotary *shall,* upon praecipe of a party:
>
> (1) enter judgment upon a nonsuit by the court, the verdict of a jury or the decision of a judge following a trial without jury, if
>
> (a) no timely post-trial motion is filed[.]

Pa.R.C.P. 227.4(1)(a)(italics added).[21]

Consequently, as no post-trial motions had been filed by the Debtor or Ms. Redden, it appears that the Plaintiffs were entitled to entry of judgment upon the filing of a praecipe. Thus, unlike in <u>Dougherty</u> and <u>Belmonte</u>, the Verdicts in this

---

[20] The jury and State Court verdicts were rendered on January 12, 2023, and the Molded Verdict was entered on the docket on January 13, 2023. Pursuant to Pennsylvania Rule of Civil Procedure 227.1(c)(1), post-trial motions must be filed within ten days of a verdict. It is undisputed that neither the Debtor nor Ms. Redden filed any post-trial motions seeking reconsideration of the Verdicts. Plaintiffs' Concise Statement ¶27; Debtor's Response to Concise Statement ¶27. The Debtor commenced his bankruptcy case on February 2, 2023, which was beyond the ten-day period to bring post-trial motions. This Court takes judicial notice that Ms. Redden also commenced a bankruptcy action before this Court on February 14, 2023—also after the ten-day post-trial motion period.

[21] Pa.R.C.P. 1042.72 was rescinded on October 17, 2012.

case were beyond the point of being disturbed[22] and the only thing preventing formalization of the judgment at the time of bankruptcy case commencement was an administrative-type task.

The factors set forth in the comments to section 13 also support the conclusion that the Verdicts are procedurally definite as to warrant collateral estoppel effect.

First, the Verdicts were adequately deliberated and firm, and the Parties were fully heard in that the Verdicts were rendered at the conclusion of a jury trial at which the Parties were given the opportunity to present evidence and testimony in support of their respective positions.

Next, while certain of the Verdicts were rendered by a jury (and therefore not by the State Court), the portion of the Verdicts rendered by the State Court itself was accompanied by statements on the record in support of the State Court's finding of liability. Specifically, the State Court cited to the factual evidence adduced and the applicable law which warranted its conclusion that the Debtor and Ms. Redden were liable under the UTPCPL.

Finally, this Court is not presently aware of any reason why the Verdicts, once reduced to judgment, could not be appealed by the Debtor.[23] See Greenleaf,

---

[22] This is not to say that the Debtor or Ms. Redden would not be permitted to appeal the judgment upon its entry. However, as noted above, appeal of judgment does not affect finality for purposes of collateral estoppel. Shaffer v. Smith, 673 A.2d at 874 ("A judgment is deemed final for purposes of *res judicata* or collateral estoppel unless or until it is reversed on appeal.")

[23] The Court does not opine, either positively or negatively, as to whether the time period to appeal would be tolled by operation of 11 U.S.C. § 108(c) and whether relief from stay must be sought by an appellant in order to perfect an appeal. Cf. Northwood Flavors Co. v. Dollar Bank, Fed. Savings Bank (In re Northwood Flavors, Inc.), 202 B.R. 63 (Bankr. W.D. Pa. 1996). See also Cathey v. Johns-Manville Sales Corp., 711

at 359 (noting that the jury verdict would have been appealable after the liability phase but-for the settlement agreement).

Accordingly, this Court finds that the Verdicts are procedurally definite and should be viewed as final for purposes of issue preclusion.

Lending further support to this conclusion is that it has previously been found that the post-petition entry of a judgment falls within the ministerial acts exception to the automatic stay.

In a matter decided by a prior sitting judge of this Court, Judge M. Bruce McCullough rejected the contention that a judgment entered post-petition was "null and void" due to violation of the automatic stay in Elec. M & R, Inc. v. Aultman (In re Aultman), 223 B.R. 481 (Bankr. W.D. Pa. 1998). In Aultman, the trial court entered an order holding that the creditor was entitled to judgment against the debtors on May 22, 1998. The debtors then filed for bankruptcy relief on June 18, 1998, and the state-court decision was entered as a judgment on the state-court docket on June 24, 1998. In re Aultman, 223 B.R. at 482-483.

In rejecting the debtors' contention that the judgment was "null and void," Judge McCullough wrote as follows:

> The debtors argue that said judgment, because it was entered upon the state court docket post-petition, must be null and void since it constitutes a violation of the automatic stay imposed as a result of the debtors' bankruptcy petition filing. However, the debtors are incorrect because (a) in Pennsylvania, the mere entry of a judgment upon a state court docket by the state court prothonotary is a purely ministerial act, see Lansdowne [v. G.C.

---

F.2d 60 (6th Cir. 1983), and Bunch v. Hoffinger Indus., Inc. (In re Hoffinger Indus., Inc.), 329 F.3d 948 (8th Cir. 2003).

Murphy Co.], 517 A.2d [1318,] 1321[(Pa.Super. 1986)]; Gotwalt v.
Dellinger, 395 Pa.Super. 439, 577 A.2d 623, 625 (1990), and (b)
performance of a purely ministerial act post-petition will not
constitute a continuation of a judicial action or proceeding against
the debtors in violation of 11 U.S.C. § 362(a)(1). See, e.g., [Soares v.
Brockton Cr. Union (In re Soares),] 107 F.3d 969, 973–74 (1st
Cir.1997); Chase Manhattan Bank v. Celotex Corporation, 852
F.Supp. 226, 227 (S.D.N.Y.1994); [Gold v. McCarthy Construction
Co. (In re Knightsbridge Development Co.),] 884 F.2d 145, 148 (4th
Cir.1989); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 527–
28 (2nd Cir.1994); [Elliott v. Papatones (In re Papatones),] 143 F.3d
623, 626 (1st Cir.1998); Bonilla v. Trebol Motors Corp., 150 F.3d 77,
86–87 (1st Cir.1998).

In re Aultman, 223 B.R. at 485.

In light of the above discussion, and considering that the Debtor does not

appear to contest the finality of the Verdicts, the Court will treat the Verdicts as

sufficiently firm and procedurally definite as to be attributed collateral estoppel

effect.[24]

## C.

The Court is thus left with the issue of whether the Verdicts align with the

requirements for finding nondischargeability under sections 523(a)(2) and/or

523(a)(6) of the Bankruptcy Code.[25]

## i.

Section 523(a)(2)(A) provides that a discharge under section 727 of the

Bankruptcy Code does not discharge an individual debtor from a debt for: "(A)

---

[24] However, even if the Verdicts were not so treated, the Plaintiffs would still prevail on their Motion for
Summary Judgment in light of the overwhelming and uncontested evidence presented in the State Court
Action, which will be discussed in reviewing the "identity of issues" prong.

[25] Exceptions to discharge are generally construed strictly against the creditor and liberally in favor of the
debtor. See, e.g., Lombardi v. Picard (In re Picard), 640 B.R. 545, 553 (Bankr. E.D. Pa. 2022). The creditor
seeking to except a particular debt from discharge bears the burden of establishing nondischargeability by
a preponderance of the evidence. Id.

false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A).

Upon a showing of nondischargeability under section 523(a)(2)(A), not only is the amount actually obtained by fraud excluded from the debtor's discharge, but also nondischargeable is the " 'full liability traceable to that sum[,]' including any liability for items such as treble and other punitive damages, attorney's fees and costs." Miller v. Grimsley (In re Grimsley), 449 B.R. 602, 621 (Bankr. S.D. Ohio 2011)(quoting Cohen v. De La Cruz, 523 U.S. 213, 219, 118 S.Ct. 1212, 1216 (1998)).

The Plaintiffs' assertions sound in false representation. See, e.g., Complaint ¶¶34-40 (discussing the Debtor's averred misrepresentations).

To demonstrate that a false representation has occurred such as to warrant section 523(a)(2)(A) relief, the following elements must be satisfied:

> (1) the debtor made a false representation; (2) the debtor knew at the time that the representation was false; (3) the debtor made the misrepresentation with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the misrepresentation; and (5) the creditor sustained damages as a proximate result of the misrepresentation having been made.

Corso v. Walker (In re Walker), 439 B.R. 854, 860 (Bankr. W.D. Pa. 2010)(citing Webber v. Giarratano (In re Giarratano), 299 B.R. 328, 334 (Bankr. D. Del. 2003), and Chase Bank USA, N.A. v. Ritter (In re Ritter), 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009)), aff'd sub nom. Corso v. Walker, 449 B.R. 838 (W.D. Pa. 2011). See also Martin v. Melendez (In re Melendez), 589 B.R. 260, 265 n.6 (Bankr. E.D. Pa. 2018)(combining first and second elements).

In evaluating whether the determinations made in a prior proceeding preclude reexamination of the facts and issues before it, a court may employ either or both of two methodologies—deductive and inductive reasoning.

> The first methodology, most commonly employed in cases in which the first court made no specific findings (such as a trial that culminated in a jury verdict), might be described as a "deductive" approach. In this approach, the bankruptcy court starts with the ultimate conclusions of the first court (which usually are not in dispute)—for example, that the court entered judgment in the creditor's favor on a particular cause of action. The court next attempts to reconstruct inferentially the necessary foundations of the prior decision. If that reconstruction process is successful, the court then compares those foundational elements of the prior court ruling to the statutory elements of the § 523(a) nondischargeability asserted by the plaintiff. This reasoning process may involve a purely legal analysis, e.g., a comparison of the necessary elements of the claim litigated in the first proceeding with the elements of the bankruptcy nondischargeability claim. Or, the bankruptcy court may consider additional materials from the first proceeding, such as pleadings, briefs and jury instructions, in an effort to ascertain what issues were actually litigated before and necessarily decided by the prior court (and, if the issues were mixed fact-law questions, the legal standard employed by the court). If the court is able to determine that particular issues were actually and necessarily litigated in the prior proceeding—be they fact issues or mixed fact-law issues—and concludes that they are identical to the issues in the bankruptcy proceeding, then relitigation of those issues will be precluded.

> A second methodology, usually employed when the prior tribunal made express findings of fact and conclusions of law, distinct from the process described above, involves what might be characterized as an "inductive" rather than a "deductive" approach. By dropping down one level and focusing on the specific findings (particularly, findings of historical fact) in the prior proceeding that are entitled to preclusive effect, under the inductive approach, the court evaluates whether the preclusive facts, considered in the aggregate, establish any or all of the elements of a § 523(a) claim.

Beard Research, Inc. v. Kates (In re Kates), 485 B.R. 86, 102–103 (Bankr. E.D. Pa. 2012)(footnotes and internal citations omitted).

Utilizing the deductive approach the Court observes that in finding the Debtor liable on the fraudulent misrepresentation count, the jury necessarily found that: (1) "the [Debtor] separately made a misrepresentation to the [p]laintiffs[,]" (2) "the misrepresentation made by the [Debtor] was fraudulent[,]" (3) the "misrepresentation was of a material fact[,]" (4) "the [Debtor] intended the [p]laintiffs to rely upon that misrepresentation when it was made[,]" (5) the [p]laintiffs relied upon the misrepresentation[,]" and (6) "the [p]laintiffs' reliance on the [Debtor's] misrepresentation was a factual cause of harm."[26] State Court Transcript, Vol. III, 112:10-25.

In comparing the determinations of the jury with those required for a finding of false representation under section 523(a)(2)(A), it is clear that in finding that the Plaintiffs sustained their state-law burden against the Debtor individually[27] the jury determined that the Debtor made a misrepresentation and that the Plaintiffs sustained damages as a result. Thereby satisfying the first[28] and last elements of the Plaintiffs' section 523(a)(2)(A) claim.

---

[26] In comparison, to show fraudulent misrepresentation under Pennsylvania law requires proof of six elements: "(1) a representation; (2) that is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or reckless disregard as to whether it is true or false; (4) with the intent to mislead another person into relying on it; (5) justifiable reliance; and (6) an injury proximately caused by the reliance." Gregg v. Ameriprise Fin., Inc., 245 A.3d 637, 645-646 (Pa. 2021)(citing Bortz v. Noon, 729 A.2d 555, 560 (Pa. 1999)).

[27] In the State Court Action, the Debtor and Ms. Redden, were each found liable by the jury on the claims of fraudulent misrepresentation, violation of Real Estate Disclosure Law, and breach of contract. See Jury Verdict 1-2.

[28] As set forth infra, the jury charge as to what constitutes a "misrepresentation" seemingly invokes not only an express false representation, but also a false pretense. Poutous v. Wolfe (In re Wolfe), 640 B.R. 87, 95 (Bankr. W.D. Pa. 2022)("The distinction between a false representation and a false pretense under Section 523(a)(2)(A) is that the former is an express statement whereas the latter is an implied misrepresentation or a product of conduct by the debtor that fostered a false impression.") Both a false representation and a false

However, things are not as clear as to the elements concerning knowledge, intent, and reliance.

As to knowledge, the jury found that the Debtor's representation was "fraudulent," but what does that mean and how does it translate to a section 523(a)(2) action?

In addressing what a "fraudulent" misrepresentation is, the State Court instructed:

> As far as fraudulent misrepresentation or nondisclosure, you should know that a person must use reasonable care to disclose a material fact.
>
> If the person knows they are making or later learns they have made a misrepresentation.
>
> Or the person knows or later learns they have made a misleading representation.
>
> Or third, the person knows they are making a misrepresentation or misleading representation or later learns that another is about to act in reliance upon it.
>
> If that person fails to do so, they are responsible for all harm resulting from that person's reliance on the misrepresentation or misleading representation.
>
> A misrepresentation is any assertion by words or conduct that is not in accordance with the facts. . . . A misleading representation is an assertion by words or conduct that is likely to mislead another regarding the facts.

---

pretense will support section 523(a)(2)(A) relief—albeit, courts have set forth the elements for each slightly differently. Compare In re Walker, 439 B.R. at 860, with In re Wolfe, at 96 (quoting KeyBank Nat'l Ass'n v. Pfender (In re Pfender), Adv. No. 20-00233-MDC, 2022 WL 696947, at *6 (Bankr. E.D. Pa. Mar. 8, 2022) (false pretenses requires that "(1) there was an omission or implied misrepresentation; (2) promoted knowingly and willingly by the debtor; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; and (4) which wrongfully induced the plaintiff to advance money, property or credit to the debtor"). As discussed *infra*, the evidence presented to the jury centered on the Debtor's affirmative representations in the Seller Disclosure Statement—thereby implying that the "misrepresentations" found by the jury fall within the category of "false representations." Nonetheless, no conclusive determination need be made because in finding fraud to support the UTPCPL claim, the State Court cited in its findings the Debtor's (and Ms. Redden's) denials in the Seller Disclosure Statement. Thus, express false representations supporting the Plaintiffs' section 523(a)(2)(A) claim have been established.

> The concealment or deliberate nondisclosure of a material fact can amount to a misrepresentation for purposes of the claim of fraudulent misrepresentation to the same degree as an actual direct misrepresentation.
>
> Thus, fraudulent misrepresentation can occur either by an actual misrepresentation or by a nondisclosure.

State Court Transcript, Vol. III, 113-114.

Thus, per the charge to the jury, a fraudulent misrepresentation can be found upon showing that the declarant either knew at the time the misrepresentation was made that it was false or discovered its falsity after and did nothing to correct the inaccuracy. This is not exactly in accord with the requirement that the Debtor "knew at the time that the representation was false[.]"

However, other portions of the charge and jury verdict shed light on the Debtor's knowledge. See Cornerstone Indus. Corp. v. Kaufman (In re Kaufman), 535 B.R. 742, 747 (Bankr. W.D. Ky. 2015)("Although [d]efendant was found guilty of fraud by the state court, several of the other jury instructions could also implicate § 523(a)(2)(A).")

In addition to the claim of fraudulent misrepresentation, the Debtor was also found liable on the claim of violation of Real Estate Disclosure Law. As set forth in the jury instruction cited above, the Real Estate Disclosure Law requires the disclosure of material defects of a property via completion and delivery of a property disclosure statement, but limits liability as follows:

> A seller *shall not be liable* for any error, inaccuracy, or omission, or omission of any information delivered to this chapter if the seller *had no knowledge of the error, inaccuracy, or omission.*

> Any person who willfully or negligently violates or fails to perform any duty prescribed by any provision of this chapter shall be liable[.]

State Court Transcript, Vol. III, 116:8-15 (italics added).

Having found the Debtor liable for the violation of Real Estate Disclosure Law claim, the jury necessarily found that the Debtor had knowledge of the error, inaccuracy, or omission in the Seller Disclosure Statement. (i.e. the source of representation(s) to the Plaintiffs).

Turning to whether "the debtor made the misrepresentation with the intention and purpose of deceiving the creditor," the Court observes that the elements required for the State Court jury's finding of fraudulent misrepresentation included that the misrepresentation was of a material fact and that the Debtor intended for the Plaintiffs to rely upon the misrepresentation when it was made.

On the point of materiality, the State Court instructed that a material fact is one that a reasonable person would find important in determining a course of action or a fact that, even though a reasonable person may not find it important, the declarant knows that that the person to whom it is said "is likely to regard it as important[.]" State Court Transcript, Vol. III, 114-115 (also noting that while the material fact is important, it does not need to be the sole or a substantial factor in influencing a reasonable person's decision).

Hence, the State Court jury found that the Debtor made a misrepresentation about an important fact (or a fact important to the Plaintiffs) and that he intended for the Plaintiffs to rely on that misrepresentation. Taking

into account the Debtor's knowledge of the falsity of the representation(s) it appears that the jury found that the Debtor intended to deceive the Plaintiffs. See Neb. Dep't of Health & Human Servs. v. Zupancic (In re Zupancic), 511 B.R. 633, 641 (Bankr. D. Neb. 2014)("The intent to deceive will be inferred when the debtor makes a false representation and knows or should know that the statement will induce another to act."(citations omitted)); Spagnuolo v. Brooke-Petit, 506 B.R. 1, 5 (D. Mass. 2014)(intent to deceive for purposes of § 523(a)(2)(A) can be shown by demonstrating that, among other things, the debtor knew or believed that the matter was not as he represented it to be).

In so finding, the Court notes that intent to deceive under section 523(a)(2)(A) has been found to have been adjudicated in a prior state court proceeding where such deceptive intent was not an express element of the standard for "deceit" applied. See Nemec v. Bolzle (In re Bolzle), 158 B.R. 853, 855 (Bankr. N.D. Ok. 1993)(finding that the first two elements of the section 523(a)(2)(A) standard applied "('the debtor made a false representation or willful misrepresentation; the representation was made with the intent to deceive the creditor') are substantially equivalent to the first four elements of jury instruction # 10's recitation ('... defendant ... made a material representation; ... it was false; ... defendant ... made it when he knew it was false, or made it as a positive assertion recklessly, without any knowledge of its truth; ... defendant ... made it with the intention that it should be acted upon by plaintiff ...')."

The final element in question (with respect to the section 523(a)(2)(A) claim) is whether the Plaintiffs did, in fact, justifiably rely on the misrepresentation.

The charge to the State Court jury falls short of the requirement as the charge only required that the Plaintiffs rely—not justifiably rely—on the misrepresentation.

The Plaintiffs point out that justifiable reliance is a necessary element of fraudulent misrepresentation under state law and that the jury found the Debtor liable on that claim. See Plaintiffs' Brief 12.  The Debtor agrees that justifiable reliance is a requirement for fraudulent misrepresentation under Pennsylvania law. See Debtor's Brief 12.

Indeed, on review of the discussions with counsel to the State Court proceedings regarding the charge to the jury, the State Court acknowledged justifiable reliance. In fact, this Court's reading is that the State Court intended to include a discussion of that standard in the charge to the jury. [29]

While Pennsylvania law may require a showing of justifiable reliance to find fraudulent misrepresentation as the State Court jury did (see Bennett v. Bennett, 168 A.3d 238, 246 (Pa. Super. 2017)(citation omitted), Gibbs v. Ernst,

---

[29] The State Court stated:

> All right. No. 24 is fraud, definition of fraud under 17.20. I will give that as to the fraud and fraudulent misrepresentation claim.

> Now, I'm not a fan of nor do I quote from cases.

> So I'm going [to] use the standard charges in connection with the fraud section, which defines fraud, fraudulent misrepresentation. It also includes reliance and justifiable reliance.

> So I, I am not going to grant your charges as set forth in 25, 26, 27, 28, and 29. However, these matters will be covered, in other words, by the charge that I would give, okay.

State Court Transcript, Vol. III, 32:2-15.

647 A.2d 882, 889 (Pa. 1994)), the Court nonetheless declines to find that this alone is sufficient for this Court to conclude that the State Court jury did, in-fact, determine that the Plaintiffs justifiably relied on the Debtor's misrepresentation. That is because, regardless of Pennsylvania law and the State Court's intent to impart the justifiable reliance standard in the charge, the jury was instructed by the State Court to apply the law as set forth in the charge and the charge did not overtly refer to justifiable reliance.

Nonetheless, the jury was not the only fact-finder during the State Court proceedings. As discussed on the record, the State Court itself was tasked with making the determination as to the Plaintiffs' UTPCPL claim. State Court Transcript, Vol. IV, 21-22.

Relative to the UTPCPL claim, the State Court found that the Debtor engaged in "deceptive practices *and* fraud," and therefore the Plaintiffs sustained their burden on that claim. See State Court Transcript, Vol. IV, 25-26 (italics added). See also 73 Pa. Stat. Ann. § 201-2(4)(xxi)(defining "unfair methods of competition" and "unfair or deceptive acts or practices" to include "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding").

Based on the findings articulated by the State Court on the record at the time of the issuance of its verdict, *supra*, it is evident that the fraudulent conduct the State Court found as a basis for the UTPCPL claim was the misrepresentations by the Debtor (and Ms. Redden). In other words, the Debtor's fraudulent misrepresentations.

36

As discussed above, fraudulent misrepresentation under Pennsylvania law requires the finding of justifiable reliance and the State Court was certainly aware of that requirement. Accordingly, this Court can deduce that the State Court determined that the Plaintiffs justifiably relied on the Debtor's misrepresentations.

In this same vein of reasoning, the Court notes that in addition to the fraud component of UTPCPL liability, the State Court also found that the Debtor and Ms. Redden had committed deceptive practices. As referenced in the Debtor's Brief, the less stringent standard of showing a "deceptive act" (in comparison to fraudulent conduct) also requires a finding of justifiable reliance. See Debtor's Brief 13; Malibu Media, LLC v. Doe, 238 F. Supp. 3d 638, 647 (M.D. Pa. 2017)("Pennsylvania courts consistently hold that a 1996 amendment of the statute to include both 'fraudulent' and 'deceptive' acts 'lessened the degree of proof required.' . . . Hence, to prevail on a claim under the catch-all provision, a plaintiff need not establish common law fraud. He need only show (1) a deceptive act likely to deceive a reasonable consumer; (2) justifiable reliance on that act; and (3) a resulting 'ascertainable loss.' ") Thus, this Court can deductively infer that justifiable reliance was so found by the State Court.

Moreover, there is ample evidence upon which the State Court could have relied in coming to the determination that the reliance was justifiable.

What constitutes justifiable reliance and its attendant parameters has been described as follows:

> Justifiable reliance is a less demanding standard than reasonable reliance and "does not mean that [the creditor's] conduct must

conform to the standard of the reasonable man." [<u>Sterna v. Paneras</u> <u>(In re Paneras)</u>,] 195 B.R. [395,] 406 [Bankr. N.D. Ill. 1996] (<u>quoting</u> <u>Field</u> [<u>v. Mans</u>], 516 U.S. [59,] 71, 116 S.Ct. 437 [1995]). Rather, justifiable reliance "requires only that the creditor did not 'blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.' " <u>Ojeda</u> [<u>v. Goldberg</u>], 599 F.3d [712,] 717 (<u>quoting</u> <u>Field</u>, 516 U.S. at 71, 116 S.Ct. 437).

Whether a party justifiably relies on a misrepresentation is "determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." <u>Id.</u>; <u>see also</u> <u>Bombardier</u> <u>Capital, Inc. v. Dobek (In re Dobek)</u>, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002)(Schmetterer, J.). "[A] person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.' " <u>Mercantile</u> <u>Bank v. Canovas</u>, 237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (Lefkow, J.) (<u>quoting</u> <u>Field</u>, 516 U.S. at 70, 116 S.Ct. 437). *"However, a plaintiff may not bury his head in the sand and willfully ignore obvious falsehoods."* <u>Johnston v. Campbell (In re Campbell)</u>, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (internal quotations omitted) (emphasis added).

<u>Handler v. Moore (In re Moore)</u>, 620 B.R. 617, 628–29 (Bankr. N.D. Ill. 2020).

During the State Court trial, the Debtor and Ms. Redden's counsel argued that the Plaintiffs should have been tipped off to existing water issues due to the presence of four catch-basins on the Property (State Court Transcript, Vol. III, 56-58), as well as the fact that the Debtor and Ms. Redden answered "yes" to the question, "Do you know the location and condition of any basin, pond, ditch, drain, swell, culvert, pipe, or other man-made feature of land that temporarily or permanently conveys or manages stormwater for the property?" on the Seller Disclosure Statement. <u>See</u> State Court Transcript, Vol. III, 52-53; Seller Disclosure Statement ¶17(O). Thus, implying that the Plaintiffs willfully ignored the possibility of water issues on the Property.

As to the latter point, the State Court Defendants' (the Debtor's and Ms. Redden's) position suggested that the Plaintiffs should have selectively chosen what to rely upon in the Seller Disclosure Statement. Afterall, in addition to disclosing that the State Court Defendants knew of a stormwater management feature, the State Court Defendants also denied knowledge of the existence of wetlands on the Property (Seller Disclosure Statement ¶17(E)), knowledge of "past or present drainage or flooding problems" (¶17(F)), knowledge of "any material defects to the Property" (¶20(F)), or any other information that "may materially and substantially affect the value or desirability of the Property" (¶20(J)).[30]

These disclosures were made with the representation that they were "accurate and complete to the best of the [State Court Defendants'] knowledge." Seller Disclosure Statement 9, ¶21. The Seller Disclosure Statement also notifies the Sellers (in this case, the State Court Defendants) that the state Real Estate Seller Disclosure Law requires disclosure of known material defects of the property to be sold. Seller Disclosure Statement 1.

Thus, the State Court Defendants' position was that it was not justifiable to rely on their express denial of flooding issues contained in disclosures mandated by state law because they also indicated that there was some type of water management feature on the Property. In essence, that the Plaintiffs should

---

[30] As reflected in the findings made by Judge Ross in rendering his verdict on the Plaintiffs' UTPCPL claim, the evidence presented in the State Court Action, including the testimony of the Plaintiffs' neighbors, photographs, and subdivision plan, clearly reflect the falsity of these representations. See State Court Transcript, Vol. IV, 24-25.

have inherently suspected that whatever stormwater feature was present, it was insufficient to manage the water flow despite the State Court Defendants' express representation that there were no known flooding issues or other material defects.

In finding liability, the State Court rejected this contention.

On review, the evidence supports the State Court's decision and also supports a finding that the Plaintiffs' reliance on the Seller Disclosure Statement was justifiable.

As to the State Court Defendant's position that the four catch-basins on the Property should have alerted the Plaintiffs to a water problem, again this argument relies on the proposition that the Plaintiffs should have assumed that the existing stormwater management feature was insufficient despite the express representation of no flooding. However, setting aside the State Court Defendants' express representation, the evidence presented at trial supports a finding of justifiable reliance.

During trial, Mr. DeMarco testified that he walked the Property prior to purchase, that the Property was snow-covered when the Property was viewed, and that the Plaintiffs were not aware of the drainage system until after purchase. State Court Transcript, Vol. II, 37:14-21, 107: 14-18, & 81:16-19.

With respect to viewing the Property and it being snow-covered during that visit, Mr. DeMarco testified as follows:

| Mr. DeCaro: | Tom, did you view the property prior to closing? |
| Mr. DeMarco: | Yes, we did. |
| Mr. DeCaro: | When did you view the property? |

| | |
|---|---|
| Mr. DeMarco: | January of '19, I believe. |
| Mr. DeCaro: | And can you describe for us what the weather conditions were like at that time? |
| Mr. DeMarco: | The yard was snow covered. |

State Court Transcript, Vol. II, 37:14-21.

| | |
|---|---|
| Mr. Havey: | I remember the discussion concerning what you did to inspect the property before, before you actually purchased it. Did you walk through the property? |
| Mr. DeMarco: | We walked around the yard. |

State Court Transcript, Vol. II, 107:14-18.

As to when Mr. DeMarco became aware of the drainage system on the Property, he stated that his knowledge came post-purchase and incident to the State Court litigation.

Mr. DeMarco specifically testified as follows:

| | |
|---|---|
| Mr. DeCaro: | Do, can you tell us what, if any, drains or drainage systems exist on your property? |
| Mr. DeMarco: | There's catch basins in the front yard and backyard. |
| Mr. DeCaro: | And are they connected? |
| Mr. DeMarco: | Yes, they are connected. |
| Mr. DeCaro: | Are the catch basins in your yard connected to each other? |
| Mr. DeMarco: | Connected to, I think, everybody's property there. |
| Mr. DeCaro: | I'm sorry, say that again. |
| Mr. DeMarco: | The, the, the pipes connect from the neighbors' yards and go into our catch basin. |
| Mr. DeCaro: | Okay. And when did you become aware of the existence of that drainage system, before or after you bought the property? |
| Mr. DeMarco: | After. |
| Mr. DeCaro: | And how did you become aware, as part of the litigation? |

| | |
|---|---|
| Mr. DeMarco: | Yes, sir. |

State Court Transcript, Vol. II, 81:3-22.

It was also stated at trial that the wetlands on the Property had been filled in by the Debtor and Ms. Redden prior to the sale and their presence was not discovered by the Plaintiffs until after.

In this respect, Mr. DeMarco testified as follows:

| | |
|---|---|
| Mr. DeCaro: | Prior to purchasing the property, were you aware whether wetlands existed on the property? |
| Mr. DeMarco: | No, we were not. |
| Mr. DeCaro: | Did you subsequently learn that there were wetlands on the property? |
| Mr. DeMarco: | Yes, we did. |
| Mr. DeCaro: | When and how did you learn that? |
| Mr. DeMarco: | Shortly after closing. It was around April of 2019 we started experiencing rain ponding and so on and so forth. |
| Mr. DeCaro: | Were you aware prior to the purchase of the property whether a drainage easement existed on the property? |
| Mr. DeMarco: | No, we were not. |

State Court Transcript, Vol. II, 30:9-22.

Mr. DeMarco further testified that the Debtor and Ms. Redden did not provide to the Plaintiffs documentation in their (the Debtor and Ms. Redden's) possession evidencing the existence of the wetlands that they had filled in until after the sale was completed.

At trial, Mr. DeMarco stated as follows:

| | |
|---|---|
| Mr. DeCaro: | Now, Tom, I've shown you what I've marked as Exhibit 4. Can you, do you agree is that the subdivision plan that the Defendants recorded relative to this property? |

| | |
|---|---|
| Mr. DeMarco: | Yes. |
| Mr. DeCaro: | Okay. And it shows five different lots on the property? |
| Mr. DeMarco: | Correct. |
| Mr. DeCaro: | And is your house 315 Blackhawk Road would it be located where Lot No. 1 is located? |
| Mr. DeMarco: | That is correct. . . . |
| Mr. DeCaro: | . . . When did you receive a copy of this document? |
| Mr. DeMarco: | It was after closing. |
| Mr. DeCaro: | After the closing? |
| Mr. DeMarco: | After closing. |
| Mr. DeCaro: | Okay. And, and how did you receive it? |
| Mr. DeMarco: | How did I receive it? |
| Mr. DeCaro: | Yeah. Who gave it to you? |
| Mr. DeMarco: | Carrie Redden and Richard Gay gave this to us. |
| Mr. DeCaro: | In the course of this litigation, what, if anything, have you learned about the wetland area that's shown on Exhibit 4? |
| Mr. DeMarco: | That it was filled in. |
| Mr. DeCaro: | By who? |
| Mr. DeMarco: | Carrie Redden and Richard Gay. |

State Court Transcript, Vol. II, 31-32.

The Plaintiffs both testified that use of the yard was important to them in deciding to purchase the Property and that they would not have if they were aware of the water issues.

As to the importance of the yard, Mr. and Mrs. DeMarco testified as follows:

| | |
|---|---|
| Mr. DeCaro: | In, in making a decision to buy the property, can you tell us how important it was to you that it had a somewhat sizable yard? |
| Mr. DeMarco: | It looked very attractive, and we were thinking about using it for picnics, cookouts, recreation. |

43

State Court Transcript, Vol. II, 72:15-20.

| Mr. DeCaro: | Can you tell us how important it was for you to have a yard you could use in deciding to buy this particular property? |
| Mrs. DeMarco: | Yes. We always have family functions. We can't use the yard to even put a table out there. |

State Court Transcript, Vol. II, 139:13-17.

Both Mr. and Mrs. DeMarco also testified that they relied upon the representations of the Debtor and Ms. Redden in making the decision to purchase the Property and that if they had known its true state, neither Plaintiff would have gone forward with the purchase.

Specifically, Mr. DeMarco testified as follows:

| Mr. DeCaro: | Now, Tom, if, if prior to purchasing the property you were aware about the flooding as you've described it and, and we've seen in the photographs, what would you have done differently? |
| Mr. DeMarco: | I would have never bought the house. |
| Mr. DeCaro: | And if prior to the purchase you were aware about wetlands and wetlands being changed, what would you have done differently? |
| Mr. DeMarco: | I would've walked away and not buy it. |
| Mr. DeCaro: | Did the representations in the Defendants' Seller Disclose Statement cause you to be misled or misunderstand, be confused about the condition of the property? |
| Mr. DeMarco: | Yes, mislead. |
| Mr. DeCaro: | And again, you relied on those representations to decide to buy it? |
| Mr. DeMarco: | That's correct. |

State Court Transcript, Vol. II, 84-85.

For her part, Mrs. DeMarco testified as follows:

44

| | |
|---|---|
| Mr. DeCaro: | And did you review the seller disclosure statement provided by the Defendants prior to the closing? |
| Mrs. DeMarco: | Yes. |
| Mr. DeCaro: | Okay. And did you review all of the paragraphs of that disclosure? |
| Mrs. DeMarco: | Yes. |
| Mr. DeCaro: | And were you relying on what was told or not told to you in that disclosure statement to decide -- |
| Mrs. DeMarco: | Yes. |
| Mr. DeCaro: | -- whether to buy the property? |
| Mrs. DeMarco: | Yes. |
| Mr. DeCaro: | Okay. You have to let me finish my question. |
| Mrs. DeMarco: | Okay. |
| Mr. DeCaro: | All right. And did you have any discussions with the Defendants or either of them prior to the closing about flooding on the property? |
| Mrs. DeMarco: | No. |
| Mr. DeCaro: | Or about wetlands on the property? |
| Mrs. DeMarco: | No. . . . |
| Mr. DeCaro: | . . . If prior to purchasing the property you were, you were aware about the flooding as, as we've seen and it's been described, tell us what you would've done differently? |
| Mrs. DeMarco: | We would had never bought the house. |
| Mr. DeCaro: | And the representations in the Seller Disclosure Statement, did it cause you to be mislead or misunderstand the condition of the property? |
| Mrs. DeMarco: | Yes. |
| Mr. DeCaro: | And again, you were relying on those statements to decide to buy it? |
| Mrs. DeMarco: | Yes. |

State Court Transcript, Vol. II, 137-140.

In addition to viewing the Property, Mrs. DeMarco testified that the

Plaintiffs did have an inspection of the Property prior to closing.

On this point, Mrs. DeMarco testified as follows:

| | |
|---|---|
| Mr. Havey: | Mrs. DeMarco, could you tell me whether or not you arranged for a house inspection prior to closing or simultaneous with the closing? |
| Mrs. DeMarco: | Yes. |
| Mr. Havey: | What happened during that home inspection? |
| Mrs. DeMarco: | The guy came in and did the inspection, checked everything. |
| Mr. Havey: | When you say "everything," do you mean everything including mold? |
| Mrs. DeMarco: | No. |
| Mr. Havey: | So he didn't include everything? |
| Mrs. DeMarco: | It was not mold at the time that he did the inspection. |
| Mr. Havey: | There wasn't mold at the time? |
| Mrs. DeMarco: | No. |
| Mr. Havey: | When did the house inspection take place? |
| Mrs. DeMarco: | Before we bought the house. |

State Court Transcript, Vol. II, 146-147.

Thus, the trial evidence does not suggest that the Plaintiffs chose to "bury their heads in the sand" and ignore patent indications of water issues. The trial evidence is that such issues were either obscured from view or were latent at the time they observed the property.

Finally, the State Court Defendants argued that due to the significant purchase price, the Plaintiffs should have conducted more of an investigation prior to buying the Property—including speaking with neighbors. State Court Transcript, Vol. III, 69-70.  That is not what justifiable reliance requires.

In fact, courts opining on the extent of investigation that a plaintiff need undertake in order to justifiably rely upon a misrepresentation have held the opposite.

> "Bankruptcy law ... does not require [plaintiffs] to have investigated the [defendants'] factual representations in order to demonstrate justifiable reliance." <u>Diamond v. Kolcum (In re Diamond)</u>, 285 F.3d 822, 827 (9th Cir. 2002), citing <u>Field v. Mans</u>, 516 U.S. 59, 70, (1995) (holding that duty to investigate was not a predicate to demonstrating justifiable reliance under § 523(a)(2)(A)), discussing Restatement (Second of Torts § 540 (1976)). <u>See also</u> <u>Apte v. Japra (In re Apte)</u>, 96 F.3d 1319, 1323 (9th Cir. 1996), citing <u>Citibank (South Dakota), N.A. v. Eashai (In re Eashai)</u>, 87 F.3d 108[2], 1090 (9th Cir. 1996); <u>[Eugene Parks Law Corp.] Defined Benefit Pension Plan v. Kirsh (In re Kirsh)</u>, 973 F.2d 1454, 1459 (9th Cir. 1992) ("Negligence in failing to discover a[n intentional] misrepresentation is no defense [to fraud.]").

<u>Ives v. Lyon (In re Lyon)</u>, Nos. 18-62661-tmr7, 18-32190-pcm7, 2022 WL 981594, at *6 (Bankr. D. Or. Mar. 31, 2022)(finding that the plaintiff-homebuyers' "decision not to perform a more intensive home inspection does not diminish their reliance on the [defendant-sellers'] representations")(parenthetical quoting <u>In re Kirsh</u> cleaned up). <u>See also</u> <u>Auction Credit Enterprises, LLC v. Desouza (In re Desouza)</u>, No. 22-40141, Adv. No. 22-04026, 2024 WL 1739526, at *4 (Bankr. E.D. Tex. Apr. 23, 2024)("[a] promisee is not . . . required to investigate even if an investigation would reveal the falsity of the promisor's representation unless the falsity is 'readily apparent or obvious or there are "red flags" indicating such reliance is unwarranted.' " (quoting <u>Manheim Automotive Fin. Servs., Inc. v. Hurst (In re Hurst)</u>, 337 B.R. 125, 133-134 (Bankr. N.D. Tex. 2005)).

The uncontested trial evidence was that the Plaintiffs made at least a cursory investigation by visiting the Property and observing its condition personally. Without the presence of a patent defect (or anything else to alert them to the flooding issue), the Plaintiffs were not required to conduct an exhaustive investigation. See In re Diamond, 285 F.3d at 827 (citing Field v. Mans, 516 U.S. at 70).

Accordingly, the evidence presented at trial supports the finding that the Plaintiffs' reliance on the State Court Defendants' representations was justifiable.

As such, the findings made in the State Court proceedings by the jury and the State Court in their roles as finders of fact, align with the elements of showing false representation under section 523(a)(2)(A).

In addition to the above, the Court also finds that the State Court would have necessarily found the same state law elements of fraudulent misrepresentation that the jury did in determining that the Debtor committed fraud relative to the UTPCPL claim—after all, the State Court set forth the standard for the jury to follow. Thus, the section 523(a)(2)(A) claim requirements that the Debtor made a false representation, the Debtor intended to deceive, and damages can be inferred as being satisfied, along with the inference that justifiable reliance was shown as discussed above. The remaining section 523(a)(2)(A) element—knowledge of falsity at the time the statement was made— was inferred from the jury's determination of violation of the Real Estate Disclosure Law and thus, without more the Court would not presume the State

Court made the requisite knowledge determination. However, the State Court did give us more in the form of factual findings. From those findings, the Court can use inductive reasoning to conclude that the requirement that the Debtor knew of the falsity of his misrepresentation at the time he made it was satisfied. For example, the Debtor (together with Ms. Redden) denied to the Plaintiffs the existence of a wetland despite providing the subdivision plan on which it was indicated.

Thus, the Court can conclude that the State Court's determination of liability on the UTPCPL claim also supports a finding of nondischargeability pursuant to section 523(a)(2)(A).

## ii.

The Plaintiffs also assert that the findings in the State Court Action satisfy the requirements of a section 523(a)(6) claim. See Plaintiffs' Brief 17. Because this Court has determined that summary judgment is appropriate and the Plaintiffs' claim is nondischargeable pursuant to section 523(a)(2)(A), this Court need not address the merits of the Plaintiffs' summary judgment request as to section 523(a)(6) at this time. See In re Aiello, 533 B.R. at 505.[31]

## D.

The Debtor argues a genuine issue of material fact exists as to the Debtor's scienter because—as the Debtor alleges—Ms. Redden completed the Seller Disclosure Statement, there are no specific findings of the Debtor's knowledge

---

[31] This Court's decision to forgo at this juncture analysis of the Plaintiffs' section 523(a)(6) claim in the context of the Motion for Summary Judgment should not be interpreted either positively or negatively as to the merits of such claim.

and intent, and Ms. Redden's scienter cannot be imputed on to the Debtor. Debtor's Brief 6-8 & 16-17.

However, in direct contrast to the Debtor's assertions, the *Jury Verdict* evidences that each of the claims adjudicated by the jury were determined as to each Ms. Redden and the Debtor, individually. Accordingly, the jury found that the Debtor's conduct supports liability for each the fraudulent misrepresentation, punitive damages, violation of Real Estate Disclosure Law, and breach of contract claims.

Moreover, in rendering its decision on the UTPCPL claim, the State Court did not expressly limit liability to only Ms. Redden and discussed the offending actions in terms of being performed by the "Defendants"—i.e. Debtor and Ms. Redden. See State Court Transcript, Vol. IV, 25:9-19 ("the *Defendants* denied that there had been any water or flooding problems on the property and that there was not a wetland on the property, both of which turned out to be untrue, . . . the survey that the *Defendants* provided to the township . . . indicated [that] a wetland was present. The *Defendants* actually denied these matters in the Seller Disclosure Law by answering no.")(italics added).

### E.

That the Plaintiffs are entitled to judgment as a matter of law is so plain in this case that even in the absence of attributing finality to the Verdicts for purposes of collateral estoppel, the Court would still find summary judgment appropriate based on the record of the case.

The evidence discerned from the Plaintiffs and other witnesses' sworn testimony at trial, as well as the exhibits of record and the evidence provided relative to this litigation, demonstrate that there is no genuine issue of material fact that each element of a nondischargeability action under section 523(a)(2)(A) is satisfied.

Much of the evidence has already been discussed, sometimes at length, above. As such, the Court will provide a general synopsis of the evidence supporting each element of a 523(a)(2)(A) claim and provide detail only where necessary.

With respect to the 523(a)(2)(A) nondischargeability claim, the evidence is that the Debtor executed the Seller Disclosure Statement containing statements disavowing knowledge of the existence of wetlands, drainage and flooding issues, or other material defects in the Property, and that such Seller Disclosure Statement was provided to the Plaintiffs prior to purchase. Thus, the evidence is that the Debtor made the representations to the Plaintiffs.

Moreover, the testimony of the neighbors regarding the pre-transfer flooding of the Property, as well as the testimony regarding the subdivision plan and filling of the wetlands by the Debtor and Ms. Redden, evidences that such representations were not only false, but that the Debtor knew of their falsity when made.

Both justifiable reliance (and the testimonial evidence supporting that conclusion) and the ability to infer intent to deceive is set forth above and the Court incorporates that discussion herein. However, with respect to the latter,

51

the Court notes that additional evidence supporting the Debtor's knowledge or intention that the Plaintiffs would rely on the Seller Disclosure Statement, includes that the Seller Disclosure Statement provides in the "Notice to Parties" section that:

> A Seller must comply with the Seller Disclosure Law and disclose to a Buyer all known material defects about the Property being sold that are not readily observable. This document must be completed by the Seller and each page initialed by the Buyer and Seller following their review. This Disclosure Statement is designed to assist the Seller in complying with disclosure requirements and to assist the Buyer in evaluating the Property being considered.

Seller Disclosure Statement 1.

Thus, it was made plain to the Debtor that the Seller Disclosure Statement was a source of information for the Plaintiffs. By making knowingly false statements in that document, the inference is that the Debtor intended to deceive the Plaintiffs.

Finally, testimony by a civil engineer and an appraiser at trial evidences that the flooding issues have resulted in a decrease in the value of the Property when comparing the appraised value "as-is" versus in a repaired state, and would cost an estimated $162,952 to remediate. Thus, the Plaintiffs have been damaged.

Accordingly, the evidence supports that all five elements of a section 523(a)(2)(A) claim for nondischargeability are satisfied and there is no genuine issue of material fact that the Plaintiffs are entitled to relief.

Bolstering the Court's conclusion is the fact that the evidence adduced in the State Court Action predominantly (if not fully) supports the Plaintiffs'

position. That is because the Debtor and Ms. Redden failed to present any evidence in support of their defense at trial.

Moreover, in this litigation the Debtor has presented no evidence to contradict the State Court trial evidence as to the essential elements of the nondischargeability claims.  The Debtor merely avers that he had no knowledge of water issues, that he did not prepare the Seller Disclosure Statement, and that if the initials on the Seller Disclosure Statement are his that he believes the Seller Disclosure Statement was not filled out when he signed it. Debtor's Brief 1-2.

These mere allegations are insufficient to merit a determination that a genuine issue of material fact exists. Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006)("Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact. . . . In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.")( internal citations omitted)).

Once a moving party has met its initial burden of "informing the court of the basis for its motion and producing evidence which it believes demonstrates the absence of a genuine issue of material fact" (In re Desouza, 2024 WL 1739526, at *2 (citing Celotex, 477 U.S. at 323)), the nonmoving party may not

rest solely upon the allegations in the pleadings and still survive the summary judgment motion. In re Desouza, at *3. Indeed, "in the absence of any proof, [the Court will not] assume that the nonmoving party could or would prove the necessary facts." Id. (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)(citation omitted)).

Moreover, the nonmoving party must lay such proof bare before the Court. Just as it has been observed that a court need not sift through the pleadings to tease out the whole of a party's arguments (see United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim. . . .  Especially not when the brief presents a passel of other arguments, . . . Judges are not like pigs, hunting for truffles buried in briefs." (internal citation omitted))), in adjudicating a motion for summary judgment a court "need not hunt through the record searching for a genuine issue of material fact." In re Desouza, at *3.

As referenced above, summary judgment is the time for the parties to "put up" their evidence to show that they have the means to back their position in order to be allowed to continue to the next round of the litigation.

The Debtor, however, has not and/or cannot satisfy the Plaintiffs' call to "put up" his evidence of genuine issue of material fact, and has not shown his right to continue forward in this litigation.

## IV.

For the foregoing reasons, the Court finds that the Plaintiffs are entitled to judgment as a matter of law pursuant to section 523(a)(2)(A) of title 11.

Specifically, because the Plaintiffs and the Debtor were party to the State Court Action and each had a full and fair opportunity to litigate their position therein, and because the Verdicts are final and the attendant findings are sufficiently aligned with the elements of a section 523(a)(2)(A) false representation claim, collateral estoppel applies and no genuine issue of material fact exists with respect to the nondischargeability claim.

As such, an order will be entered granting the Motion for Summary Judgment in favor of the Plaintiffs.

Date: June 11, 2024

Hon. Jeffery A. Deller
United State Bankruptcy Judge

Case Administrator to Mail to:

Debtor
Thomas M. & Toni A. DeMarco
Mark C. Hamilton, Esq.
Donald R. Calaiaro, Esq.

FILED
6/11/24 1:57 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA